# In the United States Court of Federal Claims

No. 12-346C
(Filed: June 22, 2012)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ELMENDORF SUPPORT SERVICES
JOINT VENTURE,

                  *Plaintiff,*

v.

THE UNITED STATES,

                  *Defendant.*

Bid protest; in-sourcing; proposed procurement; *Distributed Solutions*; prudential standing; 10 U.S.C. § 129a; 10 U.S.C. § 2463; preliminary injunction

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *S. Lane Tucker*, of Anchorage, AK, for plaintiff.

    *Arlene Pianko Groner*, U.S. Department of Justice, Washington, D.C., with whom were *Patricia M. McCarthy*, Assistant Director, *Jeanne E. Davidson*, Director, and *Stuart F. Delery*, Acting Assistant Attorney General, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

    This is an action brought pursuant to the court's bid protest jurisdiction. Plaintiff, the incumbent contractor to provide base supply services at Joint Base Elmendorf-Richardson Air Force Base, Alaska, asks the court to enjoin the Air Force from performing these services in-house. Although option years remain on the contract, the Air Force has notified plaintiff that when the latest option expires on June 29, 2012, the contract will not be renewed. Pending are plaintiff's motion for a preliminary injunction and defendant's motion to dismiss under Rule 12(b)(1) and (6) of the Rules of the United States Court of Federal Claims ("RCFC"). Defendant contends that the court's subject matter jurisdiction does not extend to challenges to in-sourcing contract services, and

that, in any event, even an incumbent contractor lacks standing to challenge an in-sourcing decision.

We heard oral argument on June 15, 2012, and ruled from the bench, denying both the motion to dismiss and the motion for preliminary injunction. For the reasons we explain below, the court possesses jurisdiction and plaintiff has the requisite standing, but the balance of hardships weighs against issuing the preliminary injunction.

## BACKGROUND[1]

Elmendorf Support Services Joint Venture ("ESS") currently provides base supply services to the Air Force at Joint Base Elmendorf-Richardson Air Force Base, Alaska ("JBER"). The contract became effective on October 1, 2005. The purpose was to provide general supply services, inventory control, customer and training services, contingency planning, and other support at JBER. The contract provided for one base year and nine option years, with the final option year ending on September 30, 2015. Plaintiff is currently in the sixth option year.

In March 2010, the Air Force conducted a "DTM-COMPARE"[2] cost comparison between plaintiff performing those services and performance by government civilian employees. The cost comparison was done in response to a statutory requirement that the Department of Defense ensure that consideration be given to whether civilian employees can be utilized to perform functions being performed by outside contractors.[3] The analysis

---

[1] The following facts are drawn from the complaint, plaintiff's motion for preliminary injunction, defendant's motion to dismiss, and declarations filed in support of the parties' respective motions. Unless otherwise stated, the facts are not in dispute. The parties agreed that it would be unnecessary for the government to produce the administrative record until after the present motions are resolved.

[2] DTM-COMPARE is a cost-comparison software tool provided by the Air Force Manpower Agency.

[3] The Ike Skelton National Defense Authorization Act for Fiscal Year 2011, Pub. L. 111-383, 124 Stat. 4127, 4184 (Jan. 7, 2011), amended 10

continue...

demonstrated that performance by government civilian employees would be more cost-effective, saving the Air Force $5.4 million or 18 percent over a five-year period.  On February 2, 2011, the Air Force notified plaintiff both verbally and in writing of its intent to in-source the contract services at the end of the sixth option year, September 30, 2012, rather than exercise an additional option year.

The Air Force encountered budget difficulties in implementing the decision to move to in-house performance, however.  In his declaration, Vincent E. Gasaway, the Chief of Manpower, Organization and Resources Division, states that the Air Force implemented a hiring freeze, which adversely affected the ability to hire the required 93 civilian employees to assume the base supply function.

The Air Force thus temporarily suspended in-sourcing in June 2011. Due to the lack of budgeted funds in the fiscal year 2012 budget, moreover, the parties entered into a bilateral contract modification on September 29, 2011, that shortened the sixth option period so that it will end on June 29, 2012, instead of September 30, 2012.  It also created a new three-month option period ending on September 29, 2012.  This allowed the Air Force to use remaining fiscal year 2011 funds for the new nine-month extension.

The temporary suspension of in-sourcing ended in October 2011. Plaintiff was notified of this fact.  The hiring freeze was also lifted in late 2011, although the Air Force predicted it would not be able to hire the required number of employees by the end of the new option period (June 29, 2012). Thus, the Air Force "determined that military manpower would be used temporarily to reduce mission risk during the transition."  Gasaway Decl. ¶ 5. According to Mr. Gasaway, the DTM-COMPARE model determined that using 74 military personnel would not exceed the cost of the contract.

The Air Force has begun hiring civilian personnel for the transition, although it is currently using a mix of military and civilian personnel to perform the services during the transition period.  It has "committed to expedite all actions associated with this hiring action and complete the

---

[3]...continue
U.S.C. § 2463 by specifically requiring the Directive–Type Memorandum 09–007 analysis.

transition to an all civilian workforce as quickly as possible."  Gasaway Decl. ¶ 5.

On February 3, 2012, the Air Force notified plaintiff that it was unlikely to exercise the remaining options and predicted that the contract would end by its own terms on June 29, 2012.  The Air Force also requested that plaintiff prepare a comprehensive transition plan. Shortly thereafter, plaintiff requested that the Air Force reconsider the in-sourcing decision.  On May 30, 2012, the Air Force notified plaintiff by letter that it was not exercising the three-month option period running from June 30, 2012 through September 29, 2012, and thus the contract would end on June 29, 2012.

## DISCUSSION

Plaintiff filed its complaint on June 1, 2012.  The gravamen is that, although the Air Force completed a DTM-COMPARE cost analysis using civilian employees, it never conducted one assuming military personnel. According to plaintiff, "in-sourcing the [s]ervices to a military workforce is likely to involve costs above and beyond those associated with in-sourcing the [s]ervices to a government civilian workforce."  Compl. ¶ 22.  Plaintiff also asserts that performance of those services by a military workforce is likely to be more costly than "performance of the [s]ervices by a private contractor such as [plaintiff]."  Compl. ¶ 23.  In addition to the cost consideration, plaintiff asserts that performance of the services by military personnel would "pose safety and mission risks."  Compl. ¶  24.  Plaintiff thus argues that the in-sourcing of the contract services lacks a rational basis, is arbitrary and capricious, and violates 10 U.S.C. § 129a and 10 U.S.C. § 2463  (West Supp. 2012), which concern force management and the use of civilian personnel in the performance of Department of Defense  ("DoD") functions.

10 U.S.C. § 129a(e) provides that if the DoD seeks to transfer performance of services from contractors to civilian employees, it must comply with 10 U.S.C. § 2463.  Section 2463, in turn, provides in relevant part:

> [I]n determining whether a function should be converted to performance by Department of Defense civilian employees, the Secretary of Defense shall--
>
> (A) develop methodology for determining costs based on the guidance  outlined  in  the  Directive-Type

Memorandum 09-007 entitled 'Estimating and Comparing the Full Costs of Civilian and Military Manpower and Contractor Support' or any successor guidance for the determination of costs when costs are the sole basis for the determination;

(B) take into consideration any supplemental guidance issued by the Secretary of a military department for determinations affecting functions of that military department; and

(C) ensure that the difference in the cost of performing the function by a contractor compared to the cost of performing the function by Department of Defense civilian employees would be equal to or exceed the lesser of--

> (i) 10 percent of the personnel-related costs for performance of that function; or

> (ii) $10,000,000.

10 U.S.C. § 2463(e) (West Supp. 2012).

In response, defendant argues that this court lacks subject matter jurisdiction under 28 U.S.C. § 1491(b)(1) (2006) because there is no pending or proposed procurement. In addition, it contends that plaintiff lacks standing because plaintiff is neither an "interested party," nor does it have prudential standing to protest the agency's in-sourcing decision because the injury that plaintiff alleges is not within the zone of interests protected by the statutes upon which it relies. Even if the court does possess jurisdiction, defendant argues that a preliminary injunction should be denied because of potential danger to the national security interests involved, exacerbated by the lengthy delay between the time that plaintiff first became aware of the proposed in-sourcing and when it brought this suit.

We note at the outset that there exists a split among the judges of this court regarding whether the decision to in-source contract services is reviewable. In *Santa Barbara Applied Research, Inc. v. United States*, 98 Fed. Cl. 536 (2011), Judge Firestone held that in-sourcing decisions are properly

within our bid protest subject matter jurisdiction, and that plaintiff there had standing to challenge the transfer of services in-house.  In *Hallmark-Phoenix 3, LLC v. United States*, 99 Fed. Cl. 65 (2011), however, Judge Allegra, without deciding the question of subject matter jurisdiction, held that the in-sourcing decision there was not reviewable based on prudential standing concerns.  We consider both approaches in turn below.

I.      The court possesses subject matter jurisdiction because the in-sourcing decision is in connection with a proposed procurement

Plaintiff relies on the final clause of § 1491(b)(1), which allows an interested party to bring suit for "any alleged violation of statute or regulation in connection with a procurement or proposed procurement."  In *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340 (Fed. Cir. 2008), the Federal Circuit considered the question of what constitutes a "procurement" for purposes of that statute.  It borrowed the definition that Congress provided in 41 U.S.C. § 403(2) (re-codified at 41 U.S.C. § 111), which relates to the creation of the Office of Federal Procurement Policy.  Based on that definition, procurements thus include "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout."  41 U.S.C. § 111 (2006).

The substance of the Air Force's decision here was to stop procuring services from plaintiff and instead to use government employees.  Because that decision necessarily included the process for "determining the need for . . . services" that plaintiff currently provides, the in-sourcing decision-making process was "in connection with a procurement or proposed procurement" within the rather generous definition adopted by the Federal Circuit.  The statutorily-required cost comparison under 10 U.S.C. § 2463 was the beginning of the contracting process here.  Other courts which confronted this issue have come to the same result.  *See Santa Barbara*, 98 Fed. Cl. at 542-43; *Triad Logistics Servs. Corp. v. United States*, 2012 U.S. Claims LEXIS 393, *45 (2012); *see also Rothe Dev., Inc. v. U.S. Dep't Def.*, 666 F.3d 336, 339 (5th Cir. 2011); *Vero Tech. Support, Inc. v. U.S. Dep't Def.*, 437 F. App'x 766,

769-70 (11th Cir. 2011); *LABAT-Anderson, Inc. v. United States*, 346 F. Supp. 2d 145, 153-54 (D.D.C. 2004).[4]

II.   Plaintiff is an "interested party" and is not otherwise barred by prudential standing concerns

Under 28 U.S.C. § 1491(b)(1), plaintiff must be an "interested party" to proceed with its bid protest in this court.   Again turning to *Distributed Solutions*, a plaintiff is an "interested party" for purposes of 28 U.S.C. § 1491(b)(1) if it establishes that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." 539 F.3d at 1344. This court and other courts have found the interested party status required by 28 U.S.C. § 1491(b)(1) in the context of a challenge to in-sourcing. *See Santa Barbara*, 98 Fed. Cl. at 542; *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 575 (2005); *see also Rothe Dev.*, 666 F.3d at 338-39; *Vero*, 437 F. App'x at 771. Having concluded that there was a proposed procurement, we have no difficulty finding that plaintiff clearly has a financial interest in maintaining its incumbency. It has demonstrated its desire for the work and, but for the in-sourcing, we have every reason to assume it would still be on the job.

*Santa Barbara* is instructive. There the court held that "[w]here . . . [plaintiff] has a track record of winning contracts for the work that the Air Force is now in-sourcing, the economic impact to [plaintiff] cannot be denied." *Santa Barbara*, 98 Fed. Cl. at 543. Here, in its most recent contractor performance assessment report, plaintiff was rated as excellent, and for the

---

[4] We note also that Congress, in adopting 28 U.S.C. § 1491(b)(5), allowed government employees to intervene in a bid protest under the reverse scenario, i.e., when the government decides to "out-source" services provided by government employees to contractors by conducting a "public-private competition" under Office of Management and Budget Circular A-76. Circular A-76 provides that the government, as a general matter, is to procure services from outside contractors if less costly than government employees. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1296 (Fed. Cir. 2001). As a result, when procuring commercial services or products, Circular A-76 requires that a cost comparison be done by comparing a bid from a private sector source with the cost of government facilities and personnel, i.e., a "public-private competition." *See id.*

duration of the contract, there is no dispute that plaintiff has performed well. Thus, there is a substantial chance that, given the opportunity, plaintiff would perform the services in the future.

Defendant contends that, even if standing concerns are satisfied in terms of a typical bid protest, nevertheless it is absent here because of the attenuated connection plaintiff has to the statutes it wishes the court to enforce. It invokes Judge Allegra's rationale in *Hallmark-Phoenix*, where he dismissed a similar protest due to a perceived lack of "prudential standing." Prudential standing is a judicially self-imposed standard used to circumscribe the exercise of federal jurisdiction. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). It is invoked when courts are reluctant to exercise jurisdiction over matters which, although nominally accessible under Article III (or Article I in this court), are really beyond the properly limited role of the federal judiciary. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Bennett v. Spear*, 520 U.S. 154, 162 (1997).

In *Hallmark-Phoenix*, Judge Allegra declined to exercise jurisdiction because, in his view, 10 U.S.C. § 129a and 10 U.S.C. § 2463 are intended to protect the government's internal budgetary interests, and are not intended to protect contractors adversely affected by in-sourcing decisions. 99 Fed. Cl. at 76. The proper remedies for violations of 10 U.S.C. § 129a and 10 U.S.C. § 2463, according to *Hallmark-Phoenix*, are legislative oversight and intervention, not judicial review. *See id.*

Judge Firestone came to the opposite conclusion in *Santa Barbara*, 98 Fed. Cl. at 544. Her view is that contractors in plaintiff's position have a real interest in the proper execution of 10 U.S.C. § 129a and 10 U.S.C. § 2463. We agree. While we recognize that Congress no doubt was motivated by fiscal concerns in requiring periodic assessment of the relative costs of having services performed by outside contractors, and that this makes such protests very different in some regards from ones in which the concerns of the Competition in Contracting Act, 31 U.S.C. §§ 3551–56 (2006), are invoked, nevertheless, the procedures and standards required by these statutes circumscribe the government's ability to bring services in-house. At a minimum, incumbent contractors have an interest in ensuring that the calculus is done properly. This competitive impulse creates an incentive to expose ways in which the government may have acted improperly. Refereeing such debates is routine work for the court.

Subsequent to oral argument, the Supreme Court in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, Nos. 11-246, 11-247, 2012 WL 2202936 (U.S. June 18, 2012), made it clear that the prudential standing test "'is not meant to be especially demanding.'" 2012 WL 2202936 at *9 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). Moreover, the test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399). In sum, having concluded that there was a proposed procurement at play here, and because plaintiff's allegation here is that the procurement (read in-sourcing process) was flawed, we are satisfied that plaintiff has standing to proceed.

III.   The balance of hardships weighs against issuing a preliminary injunction

A preliminary injunction is an extraordinary remedy. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). For the court to issue a preliminary injunction, the plaintiff must demonstrate:

> (1) that it will suffer irreparable injury if the procurement is not enjoined; (2) a reasonable likelihood of success on the merits of its claim; (3) that the harm suffered by it, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and (4) that granting injunctive relief serves the public interest.

*MORI Assocs., Inc. v. United States*, 102 Fed.Cl. 503, 519 (2011) (citing *FMC Corp.*, 3 F.3d at 427 (Fed. Cir. 1993)). "[T]he absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of injunctive relief. *FMC Corp.*, 3 F.3d at 427.

In addition to these factors, unique to the Court of Federal Claims, we have a statutory directive to "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action" when determining whether to grant a preliminary injunction in a bid protest. 28 U.S.C. § 1491(b)(3) (2006). In doing so, we are to give deference "to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter v. Natural Res. Def.*

*Council, Inc.*, 555 U.S. 7, 24 (2008); *see also North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle.").

A.    Plaintiff's potential injury

Plaintiff submitted several declarations to demonstrate the harm that it would suffer in the absence of a preliminary injunction. The thrust of the injury is economic. Plaintiff asserts that it was formed solely to work on this contract and, if the contract ends, its only source of income will cease. Additionally, Gail Schubert, President and CEO of Bering Straits Native Corporation (parent company of one of the companies that comprises ESS) stated that the Alaska Teamster-Employer Pension Plan would assess a penalty against ESS for early withdrawal from the pension plan in the amount of $7,170,513.67. Plaintiff has also submitted three declarations by Steven P. Brunin, its Program Manager. In his second declaration, Mr. Brunin states that the in-sourcing decision is causing plaintiff to lose employees to the Air Force and that plaintiff is not in a position to hire replacements.

We credit plaintiff's assertion of immediate financial harm. If this is plaintiff's only contract, then it plainly would be injured, assuming the Air Force's only option is to exercise the next option term.

We decline to give anything like conclusive weight to this factor, however, for two reasons. First, the injury to plaintiff is being triggered by the failure of the Air Force to exercise the next option year of the contract. In other words, the injury could be happening not because of an alleged procurement error, but if the Air Force simply decided not to obtain the services that plaintiff has been providing. Plaintiff should have been aware that the government was under no obligation to exercise additional options. *See* 48 C.F.R. § 2.101 (2011). If an option was not exercised, plaintiff would no longer earn profits under the contract and potentially be subject to penalties related to the pension plan.

Second, plaintiff has known about the results of the Air Force's cost comparison process and the anticipated shift to in-sourcing since February 2011. Nevertheless it chose to wait until 28 days before the end of the last option extension to file its complaint. Equity aids the vigilant, not those who slumber on their rights. *See LaForge & Budd Const. Co., Inc. v. United States*,

48 Fed. Cl. 566, 570 (2001) (citing *Cornetta v. United States*, 851 F.2d 1372, 1375 (Fed. Cir. 2005)); *see also TRW Envtl. Safety Sys., Inc. v. United States*, 16 Cl. Ct. 516, 519 (1989).

B.    Likelihood of success on the merits

Although the likelihood of success need not be shown to a mathematical certainty, plaintiff must nevertheless demonstrate that it has a reasonable likelihood of success.  The gravamen of plaintiff's complaint is that, although a cost comparison was done, it was done improperly because it assumed the use of civilian employees, whereas the Air Force is now contemplating, at least temporarily, using some military personnel.

We are not persuaded that plaintiff's argument is a likely winner.  First, the major premise–that no military personnel cost comparison was performed–appears to be flawed based on Mr. Gasaway's declaration.  He states that the "DTM-COMPARE model determined that use of 74 military would not exceed the cost of the contract operation." Gasaway Decl. ¶ 5. It thus appears that at least some form of military cost comparison was performed.  Moreover, Mr. Gasaway explains that, due to hiring controls, the Air Force anticipates that it will not be able to hire the 93 civilian employees needed to perform the services during conversion.  To mitigate this unexpected hiring problem, the Air Force "determined military manpower would be used temporarily to reduce mission risk during the transition."  Gasaway Decl. ¶ 5. He further states that, "[t]he plan is to decrease the number of military [personnel] and increase the number of civilian authorizations, not to exceed 93 Full-time Equivalents as soon as possible."  Gasaway Decl. ¶ 5.  It appears, then, that the use of military personnel is a temporary stop-gap until the Air Force is capable of hiring all of the civilian personnel it needs to perform the services.  In any event, plaintiff has not persuaded us, on first blush, that what the Air Force has done fails to comply with DTM 09-007 or is otherwise arbitrary and capricious.

C.    Harm to the government

The defendant has filed five declarations from Air Force officers addressing the likely harm that an injunction against in-sourcing would cause to Air Force operations and military readiness.  Two of the declarants, Lt. Col. Steven J. Minkin, Chief of Budget Operations, HQ Pacific Air Force, and Lt. Col. Patricia Csánk, Commander of the 673rd LRS, 673rd Air Base Wing,

JBER, made statements directly addressing the impact an injunction would have on national defense and national security. Lt. Col. Csánk stated that an injunction would have a "harmful and immediate impact on JBER's combat and deployment readiness for both exercises and real world requirements." Csánk Decl. ¶ 4. Lt. Col. Csánk further states that, due to the employees ESS has lost, if an injunction mandated ESS continue providing the services, it would "unduly jeopardize the 673d Air Base Wing and the 3rd Wing's combat and mobility aircraft operational missions and overall readiness posture . . . ." Csánk Decl. ¶ 7.

In response, plaintiff offers Mr. Brunin's declaration that employees from other contracts performed by ESS's parent company could be relocated to perform on the JBER contract. We note that this is in direct tension with his statement elsewhere that "ESS will not be in a position to hire replacement personnel for these vacant positions during the remainder of the Contract term." Brunin 2d Decl. ¶ 9. Moreover, "starting June 4, and increasing in severity from June 14 through June 18, ESS's ability to perform the Contract will be materially impaired by these Air Force actions." Brunin 2d Decl. ¶ 11.

Even if plaintiff could perform sufficiently notwithstanding the lack of employees, however, the Air Force stated that it does not have the money to pay plaintiff past June 29, 2012 without affecting military readiness. The lack of budgeted funds to pay plaintiff past June 29, 2012, is further supported by the declaration from Lt. Col. Steven J. Minkin, Chief of Budget Operations, HQ Pacific Air Force, Joint Base Pearl Harbor-Hickam, who is responsible for budgeting across the pacific theater. He states that if the transition was stopped, because there exists no more funding for the contract, the Air Force would have to "cancel planned facility renovation projects across the Pacific theater, rescind projects that have already been advertised, and incur the subsequent termination fees associated with pulling solicitations from the open market." Minkin Decl. ¶ 8. Lt. Col. Minkin recites that during an injunction, "the United States military would face financial constraints and uncertainty that would harm military readiness and national security." Minkin Decl. ¶ 9.

In response to the defendant's claim that the Air Force would have to reallocate funds from other projects, Mr. Brunin claims that the Air Force's Warehouse Shutdown Plan, a part of the transition process, calls for increasing inventory by 200%. Mr. Brunin estimates the cost of these supplies at $2.9 million, and claims that if the injunction is granted, there would be no need for the increase in supplies. Mr. Brunin proposes that this $2.9 million could fund

the continuance of services by ESS for approximately 3-4 months.  Thus, Mr. Brunin states there would be no harm to the Air Force by issuing an injunction because there are funds available for plaintiff to continue the contract.  We decline to give any weight to this assertion.  The court is not in a position to second-guess the Air Force's decisions about how to allocate limited funds. Nor do we think it is Mr. Brunin's position to do so.

The effect on military readiness is further exacerbated by the summer military exercises that are planned for JBER.  The Air Force notes that it is currently involved in a "multi-national RED FLAG" exercise.  The 673d Logistics Readiness Squadron, stationed at JBEER, "plays a significant role in these exercises in supplying and sustaining aircraft parts for numerous [United States] and multi-national air forces' weapons systems as well as providing various types of ground and aviation supplies . . . ."  Csánk Decl. ¶ 5. Lt. Col. Csánk notes that this exercise significantly increases the demand for base supply services. Lt. Col. Csánk doubts plaintiff's ability to handle this increase in demand due to its loss of employees, as confirmed by Mr. Brunin. In fact, Lt. Col. Csánk states that degradation of services has already been noticed and required the government to supplement plaintiff's employees during the most recent Operation Readiness Exercise and real-world contingency deployment operations.

Defendant points out that the harm the Air Force would suffer would be worse now than if an injunction had been issued long before the Air Force began the process of converting the services.  Plaintiff has known of the Air Force's intention to in-source the contract since February 2, 2011, after the cost comparison had been completed.  On February 3, 2012, the Air Force informed plaintiff that it was unlikely to exercise the remaining options and predicted that the contract would expire on June 29, 2012.  In February 2012, the Air Force even requested that plaintiff prepare a comprehensive transition plan.  Despite these warnings, plaintiff did not chose to file a bid protest until June 1, 2012, less than a month before their contract expired and the Air Force in-sourcing initiative would take full effect.  Undue delay is relevant in determining the extent to which it has magnified the harm to defendant.  *See Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 535 (2003) (noting that undue delay may be considered in the multi-factored injunctive analysis); *see also Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007).

13

D.      The public interest

The public interest is obviously served by requiring the Air Force to follow the law with respect to performing the requisite cost analysis.  Plaintiff recognizes that a cost-comparison was done, and defendant asserts that it was done in such a way that obviates plaintiff's concerns about the use of military personnel.  Under the circumstances, and in light of the government's un-rebutted assertions that an injunction would jeopardize national security and national defense, this factor does not favor entry of an injunction.

In sum, none of the factors militate in favor of an injunction.  While plaintiff clearly has an interest in maintaining its contract, it was slow to enforce its rights.  Nor does it appear likely that plaintiff will succeed on its narrow substantive claim.  The disorder that would result from an injunction is well established by the government, in part because of the undue delay.  And finally, there is no overriding public interest in ignoring the impact on the Air Force's concern for national security and military readiness.  Accordingly, injunctive relief is inappropriate.

## CONCLUSION

For the reasons stated above, we deny defendant's motion to dismiss. We also deny plaintiff's motion for a preliminary injunction. The parties shall submit a joint status report by July 13, 2012, detailing how they would like to proceed.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge

14